# In the United States Court of Federal Claims

No. 23-300

(Filed: June 29, 2023)
(Reissued: July 10, 2023)

_____

|  |  |
|---|---|
| **VECTRUS-J&J FACILITIES SUPPORT, LLC,** | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| **UNITED STATES,** | ) ) |
| Defendant, | ) ) |
| **and** | ) ) |
| **AMENTUM SERVICES, INC.,** | ) ) |
| Defendant-intervenor. | ) ) |

_____

Adam K. Lasky, Seyfarth Shaw LLP, Seattle, WA for plaintiff. With him on the briefs was Amy C. Hoang, Seyfarth Shaw LLP, Washington, D.C.

Stephanie A. Fleming, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. for defendant. With her on the briefs were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and William J. Grimaldi, Assistant Director, Civil Division, United States Department of Justice, Washington D.C., as well as Arun Limani, Associate Counsel, NAVFAC Pacific OOC, Pearl Harbor, Hawaii.

Kevin P. Connelly, Vedder Price P.C., Washington, D.C. for defendant-intervenor. With him on the briefs were Kelly E. Buroker, Tamara Droubi, and Jeffrey M. Lowry, Vedder Price P.C., Washington, D.C.

**OPINION AND ORDER**[1]

LETTOW, Senior Judge.

This bid protest arises from the Naval Facilities Engineering Systems Command's ("Navy's") decision awarding Amentum Services, Inc. ("Amentum") an operations support contract for facilities located in the Philippines ("Philippines contract").  Plaintiff Vectrus-J&J Facilities Support LLC ("Vectrus"), has previously challenged this award before both the Navy and the Government Accountability Office ("GAO").[2]  At issue is the Navy's decision of January 2023, denying Vectrus's agency-level protest.  While the Navy has agreed to update its cost realism analysis, it has refused to expand this corrective action to address two other alleged improprieties.  Vectrus posits: that the Navy awarded Amentum the Philippines contract notwithstanding that its proposal (1) contains material misrepresentations and (2) violates the solicitation by claiming as its own projects performed by another entity.

Vectrus challenges the Navy's refusal.  *See* Pl.'s Mot. for J. on the Administrative R. ("Pl.'s Mot.") at 38-39, ECF No. 30.  Specifically, in its motion for judgment on the administrative record, Vectrus requests that the court declare the Navy's scope of corrective action arbitrary and capricious insofar as it ignores the two alleged improprieties, direct the Navy to terminate the award, and enjoin the Navy from renewing an award to Amentum until the agency addresses these alleged improprieties in a new evaluation.  *Id.* at 40.  The government and Amentum have filed cross-motions asking that Vectrus's protest be dismissed or denied.  Def.-Intervenor's Cross-Mot. for J. on the Administrative R. & Opp'n to Pl.'s Mot. for J. on the Administrative R., ECF No. 35 ("Amentum's Cross-Mot."); Def.'s Cross-Mot. for J. on the Administrative R. & Resp. to Pl.'s Mot. for J. on the Administrative R. ("Def.'s Cross-Mot."), ECF No. 36.

The motions are fully briefed.  *See* Plaintiff's Resp. to Cross-Mots. for J. on the Administrative R. & Reply in Supp. of Mot. for J. on the Administrative R. ("Pl.'s Reply"), ECF No. 39; Def.'s Reply in Supp. of Cross-Mot. for J. on the Administrative R. ("Def.'s Reply"), ECF No. 41; Def.-Intervenor's Reply in Supp. of its Cross-Mot. for J. on the Administrative R.

---

[1] Because of the protective order entered in this case, this opinion and order was initially filed under seal.  Opinion and Order (June 29, 2023), ECF No. 47.  The court requested that the parties review the opinion and order and submit proposed redactions of any confidential or proprietary information.  The parties submitted jointly proposed redactions.  Redactions are shown by asterisks enclosed by brackets, *e.g.*, "[***]."

[2] Vectrus has challenged the award on various grounds in prior proceedings.  Its challenges to the Navy's reasonably predictive analysis were included in two GAO protests and Vectrus's agency-level protest, and its contention that Amentum made a material misrepresentation was included in the second GAO protest and Vectrus's agency-level protest. *See* Hr'g Tr. 6:8-24 (May 26, 2023) ECF No. 44; Pl.'s Mot. for J. on the Administrative R. at 16. ECF No. 30.

("Amentum's Reply"), ECF No. 40.  A hearing was held on May 26, 2023.  Hr'g Tr. 4:8-12 (May 26, 2023), ECF No. 44.

## FACTS[3]

This dispute centers on the Navy's consideration of [xxx] contracts Amentum claimed as prior performance and corporate experience in its proposals for the Philippines contract.[4]  AR 3437.[5]  All [xxx] contracts were performed by DynCorp International, LLC ("DynCorp International"), which Amentum acquired in late 2020.  Importantly, following the acquisition, Amentum retained some of these assets in a subsidiary that continued to operate under the DynCorp name ("DynCorp Subsidiary").  [xxx] of the contracts were transferred in March 2021, and the Defense Contracts Management Agency ("DCMA") recognized this novation in May 2021, AR 15525, 15620-24, before the Navy first awarded Amentum the contract.  The DCMA recognized the transfer of the remaining [xxx] after they were submitted as part of a novation package in March 2022 — after the Navy first awarded Amentum the contract, during Vectrus's first GAO-protest, and before the Navy announced its first corrective action.  AR 15362; Hr'g Tr. 60:17 to 61:3.  The Navy ultimately decided to credit Amentum with all [xxx] projects and refused to revisit this decision in its second corrective action, initiated in November 2022.  Vectrus challenges this refusal as arbitrary and capricious.

### A.  Amentum acquires DynCorp International

On November 20, 2020, Amentum's parent company acquired DynCorp International's parent company through a stock purchase agreement.  AR 15606.  At that time, DynCorp was comprised of two strategic business units ("SBUs"): DynLogistics SBU and DynAviation SBU.  AR 15525.  Before the acquisition, DynLogistics was responsible for performing all [xxx] of the relevant contracts.  AR 14440-41 ¶ 5 (Decl. of [xxx]) (May 25, 2022).  In January 2021 Amentum absorbed DynCorp International's parent company, becoming its immediate parent.  AR 15616-17 ¶ 5 (Decl. of [xxx]) (May 16, 2022).  At this point, DynCorp International became Amentum's wholly owned subsidiary.  *See id.*  Thereafter, DynCorp Subsidiary incrementally novated contracts to Amentum, including the [xxx] at issue.

---

[3] The court's findings of fact are based on the administrative record as required by Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC").  *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1357 (Fed. Cir. 2005); RCFC 52.1(c).

[4] There are [xxx] contracts at issue, but [xxx] contains [xxx] separate task orders.  *See* AR 3437 (including [xxx] task orders under the "Logistics Civil Augmentation Program (LOGCAP) IV" contract).  For simplicity, the court treats these [xxx] task orders as [xxx] contracts.

[5] In general, the administrative record is paginated consecutively with whole numbers.  At various ranges, *e.g.*, 4217.1-4217.1823, 7421.1-7421.292, it is paginated consecutively with decimals due to an "error in bates-stamping documents caused by document format issues."  *See* Def.'s Mot. for Leave to Correct the Administrative R. at 1, ECF No. 29.  Notwithstanding this error, the record is consecutively paginated and will be cited as "AR __."

Amentum acquired DynCorp International to "fully integrate DynLogistics into Amentum's Mission Readiness SBU." AR 14441 ¶ 11 (Decl. of [xxx]) (May 25, 2022). Amentum hoped to thereby create "a single, consolidated pool of employees" to draw from to accomplish new and existing contracts. AR 15618 ¶ 11 (Decl. of [xxx]) (May 16, 2022). On February 25, 2021, Amentum internally announced DynLogistics would be incorporated into Amentum's Mission Readiness SBU. AR 15355. In a contemporaneous organization chart, DynLogistics projects were isolated under their own separate sector. *See* AR 15358. Less than seven months later, on September 21, 2021, Amentum's Mission Readiness President sent an email "formally announc[ing] the organizational alignment" of the Amentum Mission Readiness and DynLogistics SBUs, attached an organization chart wherein DynLogistics programs and contracts no longer comprised their own separate sector, and thanked the leaders of DynLogistics for their work integrating the SBUs. AR 15637-40.

To "minimize disruption" during the transition, DynCorp "remain[ed] the employer of DynCorp employees," and those employees would "support Amentum and transferred contracts via established intercompany procedures" after "novation approval and contract modification." AR 15526. That said, former DynLogistics employees were subject to Amentum's code of conduct, policies and procedures, and safety program, were assigned an Amentum email address, were paid through Amentum's payroll, and were subject to Amentum's employee benefits package. AR 15613 ¶ 5 (Decl. of [xxx]) (May 16, 2022).

Novating DynCorp International's contracts to Amentum was an essential aspect of the integration process. Amentum and DynCorp International recognized that transferring these contracts and obtaining the government's recognition of the transfer "may take a substantial amount of processing time." *See* AR 15526. As reflected in a memorandum of agreement dated March 19, 2021, Amentum started this process by transferring DynCorp International legacy assets necessary to performing 48 contracts, including [xxx] at issue, to Amentum. AR 15525-35, 15666. Amentum and DynCorp Subsidiary submitted a novation agreement package that day, asking DCMA to recognize the asset transfer, which it did on May 17, 2021. AR 15468-15606, 15620-24, 15666-67. About a year after executing the 2021 memorandum of agreement, DynCorp Subsidiary and Amentum executed a notice stating that "[e]ffective on March 4, 2022, [DynCorp Subsidiary] hereby assigns" all of its assets related to ten more contracts, including the remaining [xxx] DynCorp International contracts that Amentum claimed in its 2021 proposal. AR 15404-08, 15667. Amentum then submitted a novation package containing the covered contracts to the DCMA. AR 15362.

Amentum's efforts to integrate DynCorp International throughout 2021 and 2022 overlapped with the solicitation, award, and post-award bid protests described below.

### B. Initial solicitation and award

On May 3, 2021, the Navy issued an initial solicitation for the cost-plus-incentive-fee contract to provide operations support services to naval installations throughout the Philippines. AR 311-13. The contract was for up to five years, consisting of a year-long base period with four year-long option periods. AR 305. The Navy would award the contract based on a best value tradeoff analysis of cost and four non-cost evaluation factors: (1) past performance, (2)

corporate experience, (3) technical approach, and (4) safety.  AR 2620.[6]  The Navy indicated the procurement would "follow [c]ontracting by [n]egotiations" in accordance with Federal Acquisition Regulation ("FAR") 15.  AR 286; *see also* W. Abel Keys,  Gov't Cont. Under Fed. Acquisition Reg. § 15.3 (3d ed. 2022) ("[U]nlike sealed bidding, negotiation is a procedure that includes the receipt of proposals from offerors, permits bargaining, and usually affords offerors an opportunity to revise their offers before award of a contract.").

Restrictions the Navy placed on the first two factors are at issue, specifically, the Navy's limitations on what type of entity constitutes an "offeror" and its requirement that offerors submit at least three $15 million multi-function projects as evidence of their past performance and corporate experience.

For both factors, offerors were asked to submit either multi- or single-function projects that had at "least one year of performance within a five (5) year period immediately preceding the date of issuance of the solicitation."  AR 2621-22.  At least three of the projects had to be "multi-function projects with a value of $15 million or more per year," and any single-function project "must have [had] a value of $4 million or more per year."  AR 2621-22.  The Navy would consider up to ten projects under the past performance factor and up to five under the corporate experience factor.  AR 2621-22.

Additionally, the Navy noted that "[t]he term 'offeror' typically refers to a single corporation submitting a proposal either as a prime contractor or a joint venture . . . submitting a proposal as joint-venture partners."  AR 2624.  It also indicated it would "focus on the entities submitting the proposal" and that "[p]ast performance or [c]orporate [e]xperience will not be considered for subsidiaries, sister[ ]companies, affiliates[,] or parent companies."  AR 2624.

On July 29, 2021, the Navy received proposals responding to the solicitation from Vectrus, Amentum, and a third offeror.  AR 4642, 2771, 3954, respectively.  As evidence of past performance and corporate experience, Amentum relied on [xxx] contracts DynCorp International performed.  *See* AR 3436-37.  Amentum represented that DynCorp International had "transferred its assets associated with its business units to Amentum" following the close of the November 20, 2020, transaction.  AR 9707.  It further averred that --

A novation agreement package was submitted to [DCMA] on 19 March 2021 to recognize this transfer and modify our contracts accordingly.  Subsequently, DCMA executed a Novation Agreement and Contract Modification, 17 May 2021 . . . We are awaiting [action by] individual Contracting Officers . . . to modify affected contracts, to include contracts identified in this Past Performance Volume.

As stated above, the novation from DynCorp International LLC Commercial and Government Entity (CAGE) codes and Data Universal Numbering System (DUNS) numbers to Amentum Services, Inc., CAGE code 5W3V7 and DUNS Number 961530545 is in process.  This novation includes the CAGE codes and

---

[6] This portion of the record reflects the ninth, and latest, amendment to the solicitation.

DUNS numbers of the Past Performance and Corporate Experience Contracts
listed in [Amentum's submission].

AR 3436.  The 2021 novation package referred to [xxx] of the [xxx] contracts Amentum claims
as past performance and corporate experience.  *See* AR 3436-37, 15525-35, 15666.

Amentum noted that, because of the ongoing integration and novation of DynCorp
International legacy assets, various business systems records may "reference previous name(s)
but are all applicable to Amentum."  *See* AR 2829.  Amentum made a copy of the novation
agreement available upon request.  AR 2829.

The Navy assessed these proposals and deemed each of the [xxx] contracts relevant
before assigning Amentum the highest possible ratings on past performance and corporate
experience — substantial confidence and outstanding, respectively.  *See* AR 1741-42, 9483-86,
12833.  It also determined that Amentum was the best value offeror and Vectrus was the second-
best value offeror.  *See* AR 12840-41.  The Navy awarded Amentum the contract based on this
assessment.  *See* AR 12842.

### C. *Vectrus's first GAO protest and the Navy's first corrective action*

Vectrus filed its first bid protest contesting this award on February 16, 2022.  AR 13209;
*see also* AR 13252, 13481 (supplementing Vectrus's first bid protest).  Vectrus argued that the
Navy improperly credited Amentum with DynCorp International's contracts in assessing
Amentum's past performance and corporate experience.  *See* AR 13481-82.  On March 4, 2022,
Amentum transferred the DynCorp International legacy assets related to the remaining [xxx]
contracts included in Amentum's proposal.  AR 15402-08, 15667.

On March 30, 2022, the Navy announced it would take corrective action.  AR 13579.
Specifically, the Navy initially indicated it would reevaluate the offerors under factors 1-3 and its
best-value award and later reopened "limited discussions regarding [the] subject solicitation."
AR 13579, 13585, 13729.  It would terminate the contract with Amentum only if the corrective
action resulted in a new award decision.  AR 13579.  A day later, Amentum submitted the
novation package containing the remaining [xxx] contracts to DCMA.  *See* AR 14997,
15362-466.

As the Navy later explained, "[t]he very nature and detail" of Amentum and DynCorp's
relationship was the "*raison d'etre* of the agency's corrective action."  *See* AR 19575.  As part of
this corrective action, the Navy asked Amentum to "explain how each of the contracts submitted
under [f]actors 1 and 2 meets the requirements of the [solicitation]."  AR 13587.  In particular,
the Navy wanted to know "whether or not [DynCorp] . . . remains a separate legal entity from
Amentum."  AR 13587.

Amentum responded that all [xxx] contracts met the solicitation's requirements because
"the contracts along with all assets and resources utilized for performance have been assigned
and transferred over to Amentum."  AR 13744.  Amentum represented that [xxx] contracts "have
already been formally modified to reflect the novation" and that modifications to the remaining

[xxx] "are pending and anticipated to be received in the near future." AR 13744. It claimed it should be credited with these contracts because "novation modifications are simply to recognize formally the legal transfer . . . that has already occurred." AR 13744-45. Amentum advised that DynCorp Subsidiary still existed as a separate legal entity from Amentum "but only until such time as all [DynCorp] contracts have been formally closed out or a final novation . . . is completed." AR 13745. Notwithstanding DynCorp Subsidiary's separate existence, Amentum averred that it "integrated all of these contracts" into its own organizational structure and "has full control, use and oversight of the assets, systems, management, personnel and resources needed or utilized to perform these programs." AR 13745.

The Navy determined none of the [xxx] contracts met the solicitation's requirements and so none would be considered. AR 13782-83. Accordingly, it asked Amentum to provide contracts that conformed to the solicitation's terms. AR 13783.

### D.  Amentum's agency-level protest and the Navy's award affirmance

Amentum challenged the Navy's decision in an agency-level protest on May 6, 2022. AR 13784. Amentum contended that it should be credited with all [xxx] contracts because Amentum "effectively merged" DynLogistics into Amentum when it formally transferred "almost all of the prior DynLogistics" SBU contracts and assets and thereby "bec[ame] the successor contractor to that portion of DynCorp's assets and contracts." AR 13785.

The Navy asked Amentum to explain, with substantiating documentation, "what assets have been transferred from DynCorp to [Amentum] relating to the [c]laimed [p]rojects, and the current status of DynCorp employees that worked on the [c]laimed [p]rojects." AR 13807. According to the Navy, this information "is necessary for the Agency to determine whether or not DynCorp has transferred to [Amentum] resources sufficient for the Claimed Projects to be reasonably predictive of [Amentum's] performance under this [solicitation]." AR 13807.

Amentum complied with these requests and submitted documentation, including both the 2021 asset transfer and novation package and, for the first time, the 2022 memorandum of agreement. *See* AR 13787-88, 14022.5-22.6; Pl.'s Mot. at 12. Amentum also averred that software systems, company officers, [xxx] legacy executives and supervisors, and [xxx] non-supervisory employees involved in performing the DynCorp contracts had been transferred to Amentum. *See* AR 16262. Specifically, regarding the status of DynCorp employees who worked on the claimed projects, the Navy found that Amentum established that "[t]he vast majority . . . remain with Amentum, . . . and continue to work the contracts." AR 15696; *see also* AR 14997, 15643-58 (identifying the employees who worked on the [xxx] contracts that remained employed in Amentum's Mission Readiness SBU). Moreover, the Navy found that these legacy personnel "are no longer under the old DynCorp employee benefit package, but are all now under the Amentum Services, Inc. employment platform . . . are subject to all Amentum policies and procedures and the Amentum Code of Conduct[,] . . . [and] are paid using Amentum's bonus plans and structures, via Amentum payroll." AR 15697.

Upon reviewing this additional information, the Navy found Amentum could rely on the claimed projects, *see* AR 14067, concluded its first corrective action, and affirmed its award to

Amentum on August 4, 2022. AR 16400. The Navy identified eleven findings supporting its decision. AR 16262.

### E. Vectrus's second GAO protest and agency-level protest

Vectrus protested the award affirmance before GAO on August 23, 2022. AR 16553. Vectrus argued Amentum should be excluded from consideration for making a material misrepresentation regarding the transfer status of the [xxx] DynCorp contracts and challenged the Navy's cost realism analysis and decision to credit Amentum with the [xxx] contracts. AR 16553-54, 19453-54.

GAO held an outcome prediction meeting, a form of alternative dispute resolution, and concluded it would likely sustain Amentum's allegation that the Navy erred by failing to conduct an updated cost-realism analysis. AR 19649. GAO informed the parties that the other grounds "would likely either be denied or dismissed." AR 19649.

GAO's outcome prediction prompted the Navy to take corrective action. AR 19650. Specifically, the Navy would perform the updated cost realism analysis and, if that analysis resulted in a different award decision, "terminate the contract awarded to Amentum . . . and make a new award." AR 19650. Vectrus challenged the scope of the Navy's corrective action in an agency-level protest, contending it lacked a rational basis because it failed to address Amentum's alleged material misrepresentation and the Navy's decision to credit Amentum with the DynCorp contracts. *See* AR 19453-54, 19656-60. The agency denied Vectrus's protest on January 5, 2023. AR 19674, 19677-79.

### F. Instant proceedings

Vectrus filed a bid protest with this court on February 29, 2023. Compl., ECF No. 1. Vectrus raises the same challenges to the Navy's scope of corrective action that it raised in its most recent agency-level protest. It asks this court to direct the Navy to terminate the award and enjoin the Navy from re-awarding Amentum the contract until the Navy addresses these alleged infirmities. Briefing has been completed, and the court held a hearing on the competing motions on May 26, 2023.

### STANDARDS FOR DECISION

### A. Scope of an agency's corrective action

To prevail, a bid protestor must establish that the "procurement decision . . . is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 992 (quoting *Croman Corp. v. United States*, 724 F.3d 1357, 1363 (Fed. Cir. 2013)); *see also* 5 U.S.C. § 706(2)(A). Matters of regulatory interpretation are questions of law reviewed without deference. *Eagle Techs., Inc. v. United States*, 163 Fed. Cl. 692, 701 (2022).

In contrast, this court reviews challenges to the scope of an agency's corrective action under the "'highly deferential' 'rational basis' standard." *Dell Fed. Sys., L.P.*, 906 F.3d at 992. Under this standard, the corrective action will be upheld so long as "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Id.* (quoting *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004)). "This standard becomes more deferential when dealing with a negotiated procurement." *Overstreet Elec. Co. v. United States*, 59 Fed. Cl. 99, 117 (2003). Moreover, "a court must grant even more deference to the evaluator's decision" when it "involves performance standards." *Id.* Together with the deference required under the Administrative Procedure Act, these two additional layers create a significant level of deference. *See Alisud - Gesac Handling - Servisair 2 Scarl v. United States*, 161 Fed. Cl. 655, 668 (2022).

In addition to establishing the action was arbitrary, capricious, or otherwise not in accordance with law, the protestor must also show that "it was prejudiced by the government's actions." *PAE Applied Techs., LLC v. United States*, 154 Fed. Cl. 490, 509 (2021).

## B. *Injunctive relief*

Because a permanent injunction is an "extraordinary remedy," one "should not be granted as a matter of course." *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). Instead, such relief is warranted only if "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Dell Fed. Sys., L.P.*, 906 F.3d at 990-91 (quoting *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009)).

## ANALYSIS

Rather than allowing a wide range of projects to be considered in determining past performance and corporate experience, the Navy imposed requirements it hoped would ensure the projects submitted were very instructive proxies of an offeror's ability to perform the project in question. Applied faithfully, these constraints would alleviate the need to assess each claimed project more granularly. By contesting whether Amentum permissibly relied on DynCorp projects in bid protests before the GAO and Navy, Amentum and Vectrus have forced the Navy to analyze in detail whether the DynCorp contracts are reasonably predictive of Amentum's ability to perform the contract. The Navy answered this question affirmatively. Vectrus contends the Navy should be required to rerun this analysis.

## A. *Jurisdiction*

The court has jurisdiction over an interested party's objection to a federal agency's contract award. 28 U.S.C. § 1491(b)(1). This jurisdiction includes the power to award declaratory and injunctive relief. 28 U.S.C. § 1491(b)(2). An actual bidder that has a "direct economic interest" in the protest, *i.e.*, "a 'substantial chance' of winning the contract," is an interested party. *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012) (quoting *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1308 (Fed. Cir. 2006)). This

court's "bid protest jurisdiction" also encompasses a protestor's challenge to an agency's decision to take corrective action in response to a bid protest, "even when such action is not fully implemented." *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1381 (Fed. Cir. 2012).

Neither party disputes the court's jurisdiction. The Navy's scope of corrective action is within the court's bid protest jurisdiction. Moreover, Vectrus is an interested party. It was an actual bidder and, as the second-best value offeror behind Amentum, has a substantial chance of winning the contract pending the outcome of the Navy's corrective action.

### B. Material misrepresentation

To warrant relief, a misrepresentation must be "material and relied on" by the agency. *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1317 (Fed. Cir. 2007). This court has sometimes also required the misrepresentation be intentional. *See, e.g.*, *Golden IT, LLC v. United States*, 157 Fed. Cl. 680, 701 (2022) ("[A]n offeror may not knowingly misrepresent a material fact in a proposal for the purpose of winning a government contract."); *Alaska Structures, Inc. v. United States*, 144 Fed. Cl. 80, 84 (2019) ("The bidder must . . . intend the incorrect statement."); *but see Connected Glob. Sols., LLC v. United States*, 160 Fed. Cl. 420, 423-24 (2022); *Canpro Invs. Ltd. v. United States*, 130 Fed. Cl. 320, 343 (2017). A misrepresentation is intentional if the offeror knew or should have known it was false at the time the representation was made. *See Golden IT, LLC*, 157 Fed. Cl. at 703-04. Circumstantial evidence can be sufficient to prove intent. *See Plan. Rsch. Corp. v. United States*, 971 F.2d 736, 742 (Fed. Cir. 1992). "Whether a statement is false depends on the meaning of the words in all the circumstances, including what may fairly be inferred from them." Restatement (Second) of Contracts § 159 cmt. a. (1981). A misrepresentation can arise from the failure to "include qualifying matter necessary to prevent the implication of an assertion that is false." *Id.* at § 159 cmt. b.

Vectrus maintains that Amentum's 2021 proposal falsely represented that DynCorp had already transferred its assets associated with all [xxx] DynCorp contracts to Amentum, and "more specifically [that] a novation package had been submitted to DCMA to recognize the transfer." Pl.'s Mot. at 22. Vectrus further avers that "there can be no doubt that Amentum knew" or should have known its statements regarding the timing of these transfers were false, *id.* at 23, because they "pertained to Amentum's own corporate restructuring" and are contradicted by documents Amentum possessed, Pl.'s Reply at 8-9. The government and Amentum argue Amentum represented only that it had initiated the process of formally novating the [xxx] contracts to Amentum and that the novation process was ongoing, not that all the contracts in question had been submitted to DCMA for approval of novation. Def.'s Cross Mot. at 18; Amentum's Cross-Mot. at 3.

Vectrus points out that Amentum stated in its proposal that "[a] novation package was submitted" to and "executed" by DCMA and that DynCorp "transferred assets" to Amentum, AR 3436, in the *past tense and without any condition or exception*," Pl.'s Reply at 2; Hr'g Tr. 8:13-25. Vectrus interprets this statement to mean that assets associated with all [xxx] contracts had been transferred. But when Amentum made these representations, it had submitted only the

[xxx] of the [xxx] contracts contained within the 2021 novation package.  Amentum would neither submit the remaining [xxx] contracts as part of a novation package to DCMA nor execute a memorandum of agreement transferring the contracts to Amentum until 2022.  According to Vectrus, Amentum's statements are false notwithstanding the "in process" language, because that phrase refers to efforts by DCMA contracting officers "to modify affected contracts" that had already been submitted as part of the 2021 novation package.  Pl.'s Reply at 2-4; AR 3436.[7]  Vectrus avers its reading is confirmed by the 2022 memorandum of agreement that states that the [xxx] remaining contracts and associated assets were not transferred until March 4, 2022.  Pl.'s Reply at 4-5; AR 15404.

The government and Amentum argue that Amentum's 2021 proposal made evident that Amentum claimed the DynCorp contracts because it "controlled all [DynCorp] Legacy assets" "[b]y nature of the parent controlling relationship," AR 3436; Hr'g Tr. 54:16-18, and that Amentum was in the process of integrating DynCorp Subsidiary into Amentum by incrementally transferring these assets, including those associated with the [xxx] contracts, Def.'s Cross-Mot. at 17-18.  Amentum's proposal accurately characterized the novation was "in process" and includes "contracts identified in *this* Past Performance Volume."  Def.'s Reply at 15-16 (quoting AR 3436).  Amentum did not state the novation had been completed for all [xxx] contracts.  *See id.* at 15.  The government relies on Amentum's statement that it had executed the 2021 novation agreement that "includes . . . the CAGE codes and DUNS numbers of the Past Performance and Corporate Experience Contracts listed in [Amentum's submission]."  *See* Def.'s Cross-Mot. at 18; AR 3436.  Per the government, this language communicates a step Amentum had taken to novate some of the [xxx] contracts and that the remainder would be novated in the future.  Def.'s Cross-Mot. at 18.  It also relies on the "in process" language, arguing that it extends to the broader novation process — not just DCMA's processing of the 2021 novation package.  *See id.*  In response to the statements in the 2022 memorandum of agreement, the government argues that Amentum permissibly claimed all [xxx] projects as its own because that memorandum marked the transfer of only the "responsibility for administering the contracts" not of the assets needed to perform the contracts, which were transferred at the time Amentum first acquired DynCorp.  *See id.* at 18.  The government argues that the foregoing also shows that Amentum has provided no evidence of intent to mislead the Navy.  *Id.* at 19.

Amentum separately argues that at the time of its proposal DynCorp was a subsidiary, and it accurately represented that it was relying on past experience of a subsidiary.  Amentum's Reply at 15.  This was permissible under the solicitation's terms because DynCorp became a subsidiary only temporarily, as part of the integration process, and because Amentum was DynCorp's successor with respect to the [xxx] contracts at issue insofar as Amentum possessed "the assets used by DynLogistics in the performance of DynCorp legacy contracts" when Amentum submitted its 2021 proposal.  *See* Amentum's Reply at 18-19, 23-24.

The court finds Amentum's statements in its July 2021 proposal are not misrepresentations because they are not false.  Instead, Amentum accurately represented that the

---

[7] According to Vectrus, Amentum's proposal did not cure these misstatements by making the novation agreement available on request because the Navy is permitted to rely on representations made within a proposal without resort to extrinsic documents.  Pl.'s Reply at 6-7.

contracts it relied upon to demonstrate its past performance and corporate experience were in the novation process. Novation requires the company seeking novation to take certain actions and submit supporting documentation of these steps to DCMA for approval. *See* FAR § 42.1204 (listing documents that must be submitted as part of a novation agreement). Completing these activities and preparing these documents takes time. Amentum identified some of the steps it had taken in the novation process, including transferring the assets associated with the contracts in question from the "DynLogistics and DynAviation business units to its immediate parent and controlling company, Amentum" and submitting a novation agreement to DCMA to "recognize this transfer and modify our contracts accordingly." AR 3436. Regarding DCMA's recognition of the transfer of relevant assets, Amentum represented that DCMA executed one novation agreement. AR 3436. But Amentum also represented that it was waiting for DCMA to take further steps necessary to complete the novation process for the affected contracts. AR 3436. The steps Amentum took in preparing novation packages, its submission of those packages to DCMA, and DCMA's execution of those agreements and subsequent modification of the contracts are all part of "the novation" Amentum refers to as "in process" in its July 2021 solicitation. *See* AR 3436.

Vectrus's general misrepresentation claim turns on whether it was false that "[DynCorp International LLC] transferred assets associated with its DynLogistics and DynAviation business units" to Amentum. AR 3436; *see also* AR 9707 ("Following the close of the [November 2020] transaction, [DynCorp International LLC] transferred its assets associated with its business units to Amentum Services, Inc."). The record supports the Navy's finding that DynCorp International transferred all assets associated with DynLogistics and DynAviation when Amentum's parent acquired DynCorp International's parent in January 2021. *See* AR 14161, 14164, 14167 (recognizing the merger of DynCorp International's immediate parents into Amentum). The March 2021 memorandum of agreement confirms that DynCorp Subsidiary then transferred "all assets" related to 48 contracts identified therein, including [xxx] of the [xxx] at issue, to Amentum. *See* AR 15525, 15530, 15532-35. Accordingly, all DynLogistics and DynAviation assets had been transferred to a wholly owned subsidiary of Amentum and some of those assets had been transferred to Amentum by the time it submitted its initial July 2021 proposal. Amentum's proposal put the Navy on notice that some of the relevant assets were controlled only "[b]y nature of the parent controlling relationship." AR 3436. Even more specifically, Amentum represented that the novation of the [xxx] contracts had been initiated but not completed. AR 3436 ("As stated above, the novation from DynCorp International LLC . . . [CAGE] codes and . . . [DUNS] numbers to Amentum Services, Inc. . . . is in process.").

Next, Amentum did not falsely state that the novation package submitted to DCMA on March 19, 2021, included all [xxx] contracts. Amentum provides examples of steps it had taken to novate the contracts and assets claimed in past performance, including acquiring DynCorp International, transferring assets associated with DynCorp International's business units to Amentum, and submitting a novation agreement package to DCMA. The "as stated above" language in the next paragraph of Amentum's proposal refers to all of these steps as examples supporting its claim that the overall novation was "in process." *See* AR 3436. Accordingly, Amentum accurately represented that the novation in process included all [xxx] contracts, even though the March 19, 2021 novation package contained only [xxx].

Because the statements at issue in Amentum's 2021 proposal were not false at the time they were made, Amentum made no misrepresentations. As such, the Navy reasonably declined to address Vectrus's material misrepresentation allegations in its second corrective action.

### C.   The Navy did not err in finding that DynCorp's contracts were reasonably predictive of Amentum's ability to perform the Philippines contract

The parties' arguments concerning the Navy's reasonably predictive analysis address, albeit from different angles, the same question: did the Navy permissibly credit Amentum with DynCorp's contracts? Vectrus challenges the Navy's decision to credit Amentum with DynCorp's contracts on three grounds: (1) the decision contradicts the solicitation's terms because DynCorp is Amentum's subsidiary, Pl.'s Mot. at 25-27; (2) the Navy did not and could not reasonably make the requisite threshold finding that DynCorp was Amentum's predecessor, *id.* at 27-35; and (3) the Navy's decision "is unsupported (if not contradicted) by the record," *id.* at 36. The government and defendant-intervenor argue the Navy permissibly attributed DynCorp's contracts to Amentum as predecessor experience and that the Navy's choice of corrective action should be upheld because this court gives substantial deference to procurement officials' past performance evaluations. Def.'s Cross-Mot. at 10-17; Amentum's Cross-Mot. at 20-32. The parties agree that DynCorp became a wholly owned subsidiary of Amentum in January 2021 but disagree on whether the Navy permissibly deemed DynCorp to be Amentum's predecessor for the purposes of crediting Amentum with the [xxx] contracts.

#### 1.   The Navy's reasonably predictive analysis complied with the solicitation.

In assessing whether an agency may credit an offeror with performance or experience of a related entity, this court starts by giving effect to the relevant solicitation provisions. *See KGJJ Eng'g Sols., LLC v. United States*, 161 Fed. Cl. 556, 565-66 (2022); *Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 749 (2008). Here, the solicitation prohibited the Navy from attributing a subsidiary's work to its parent but was silent regarding predecessor experience. AR 2624.

Vectrus contends that the solicitation prohibits the Navy from crediting Amentum with the DynCorp contracts because the contracts represented the past performance and corporate experience of a subsidiary. Pl.'s Mot. at 25-27.[8]

In response, the government distinguishes between DynCorp Subsidiary and DynCorp the "former independent company that conveyed the assets which are the source of the contract experience on which Amentum relies." Def.'s Cross-Mot. at 12. The Navy permissibly credited DynCorp contracts to Amentum because DynCorp acquired that experience before it was

---

[8] Vectrus also reads the solicitation to require that the offeror performed work on the project no later than May 3, 2020. Pl.'s Reply at 17. Because Amentum acquired DynCorp after that date, Vectrus argues Amentum could only be credited with performance occurring after May 3, 2020. *See id.* As addressed *infra*, at 14-16, finding DynCorp is Amentum's predecessor entails attributing DynCorp's past performance and corporate experience to Amentum as if Amentum itself had performed the work on the contracts in question, including work completed before May 2020.

purchased and the presence of any DynCorp assets in an Amentum subsidiary rather than Amentum itself "was incidental to the integration of the merger assets" from pre-acquisition DynCorp into Amentum.  Def.'s Reply at 2-3.  Alternatively, the government contends that "there can be no dispute that these assets were part of 'the Offeror,' Amentum, rather than a 'subsidiary'" as of Amentum's July 2022 proposal, because at that point the transfer of all [xxx] contracts had been completed.  Def.'s Reply at 3.  Defendant-intervenor makes a similar argument.  Amentum's Reply at 7-8 (arguing the Navy's first corrective action establishes that it "clearly understood that subsidiary past performance and corporate experience were prohibited" and found Amentum, the actual offeror, "possessed the assets and personnel that performed the prior contracts").

The solicitation does not define predecessor or prohibit the Navy from treating DynCorp as Amentum's predecessor rather than a subsidiary.  The Navy received ample information to support this decision from Amentum's proposals, the Navy's first corrective action, and the information the Navy received during Amentum's agency-level protest and relied upon to affirm its initial award to Amentum.  Taken together, this information conveys an organic and incremental integration process.  First Amentum acquired DynCorp's parent, preserving DynCorp Subsidiary.  Next it began the parallel processes of integrating DynLogistics into Amentum's Mission Readiness SBU and obtaining the government's recognition that the assets and contracts had been transferred.  At all times Amentum controlled the assets relevant to the contracts, and, at each stage, Amentum obtained increasingly direct control over those assets.  The Navy monitored this process from Amentum's first proposal and assessed its decision to credit Amentum with DynCorp's past performance and corporate experience at various points throughout.  Both the integration and the formal recognition of the constituent transfers were completed before the Navy confirmed that DynCorp was Amentum's predecessor with respect to the contracts.  In the circumstances, the Navy's refusal to revisit this decision now is reasonable.

   2.  *The Navy's reasonably predictive analysis complied with the relevant FAR provisions.*

The Navy's refusal to revisit its reasonably predictive analysis is consistent also with federal acquisition regulations governing source selection authorities' consideration of predecessors.  Under the FAR, agencies should consider "past performance information regarding predecessor companies . . . when such information is relevant to the instant acquisition."  FAR § 15.305(a)(2)(iii).  That provision does not define predecessor or successor, but another provision defines these terms in the context of whether an entity should be listed as a successor or predecessor in the Federal Awardee Performance and Integrity Information System ("FAPIIS").[9]  In that context, a predecessor is an "entity that is replaced by a successor," and a successor is an "entity that has replaced a predecessor by acquiring the assets and carrying out the affairs of the predecessor under a new name."  FAR § 52.204-20(a)(2).

---

   [9] This database collects information on a corporation's "parent, subsidiary, or successor entities" to help acquisition officials assess that corporation's "performance and integrity . . . in carrying out Federal contracts and grants."  41 U.S.C. § 2313(a), (d)(3).

Whether an entity is a predecessor and whether another entity's performance is reasonably predictive of the offeror's contemplated performance track similar facts about those two entities' relationship.  Particularly relevant to both inquiries is the extent to which the successor-offeror controls the assets, personnel, and technologies deployed in the past performance.  *See in re Choctaw Staffing Sols.*, B-413434, 2016 WL 6212358, at *4-5 (Comp. Gen. Oct. 24, 2016).  In *Choctaw*, the offeror represented that the entities whose past performance it claimed remained separate.  *Id.* at *4.  The agency determined the offeror could not rely on these other entities' past performance because the offeror's proposal did not show how key personnel from the past projects would be meaningfully involved in the contemplated contract.  *Id.* at *3-4.  GAO upheld the agency's refusal, noting that those entities had been neither acquired nor merged with the offeror, nor had they been "reorganized, restructured, or otherwise altered."  *Id.* at *4 (internal quotes omitted).  In short, "[t]hey remain[ed] separate and distinct entities" from the offeror.  *Id.*  In conducting this analysis, GAO stated "[t]he key consideration is whether the experience evaluated reasonably can be considered predictive of the offeror's performance under the contemplated contract."  *Id.* at *3.

Vectrus contends the Navy cannot have permissibly credited Amentum with DynCorp's contracts because it never found DynCorp is Amentum's predecessor.  Pl.'s Mot. at 27-28.[10] According to Vectrus, "*an agency must first make the threshold determination that said company is a 'predecessor' company to the offeror*" before conducting the reasonably predictive analysis.  Pl.'s Mot. at 27.  On Vectrus's reading, *Choctaw* supports this assertion because there the agency did not execute the reasonably predictive analysis after it found the company whose experience the offeror claimed as predecessor experience was not, in fact, the offeror's predecessor.  *Id.*  The Navy's failure to make this finding here is "particularly troubling" to Vectrus because the government and Amentum disagree about whether DynCorp, the legal entity, or the DynLogistics business unit was found to be Amentum's predecessor.  Pl.'s Reply at 18-19; *see infra*, at 16 (arguing only legal entities can be predecessors).

Both the government and Amentum argue that the Navy found Amentum was DynCorp's successor notwithstanding the Navy's failure to "use the phrases 'predecessor' or 'successor' in its evaluation."  Amentum's Cross-Mot. at 26; Def.'s Cross-Mot. at 13.  Specifically, they contend that this finding stems from the Navy's reasoning that "[Amentum] has acquired significant resources and personnel associated with the DynLogistics business unit which is no longer a part of DynCorp, and which are sufficient for crediting [Amentum] with experience and past performance for the [Claimed Projects]."  Def.'s Cross-Mot. at 13 (quoting AR 19400-01); *see also* Amentum's Cross-Mot. at 26.  As Amentum points out, the Navy's first corrective action affirmed the award only after asking Amentum to demonstrate why it was DynCorp's successor.  Amentum's Reply at 9-10.  Moreover, neither the solicitation nor the FAR requires that the Navy formally find a predecessor-successor relationship exists.  Def.'s Reply at 7.  The government points out that, in *Choctaw*, the GAO also did not require such a determination be made before conducting the reasonably predictive analysis.  *Id.* at 7.

---

[10] Vectrus also avers that such a finding is not embedded in the Navy's conclusion that DynCorp's performance is reasonably predictive of Amentum's.  *See* Pl.'s Reply at 18.

Vectrus next argues that the Navy could not reasonably have found either DynCorp or DynLogistics was Amentum's predecessor.  Pl.'s Mot. at 28-29.  Vectrus relies on the fact that Amentum represented "at all times relevant" that it was not DynCorp's successor in the System for Award Management ("SAM") database.  Pl.'s Mot. at 30-31.[11]

Vectrus also relies on its argument that DynCorp and DynLogistics cannot be "predecessors" under FAR § 15.305 because they are not entities that "no longer exist."  Pl.'s Reply at 24-30.  Vectrus cites FAR Council notes promulgating a different provision, FAR § 52.204-20, to support its definition of "predecessor."  Those notes state that, as used in that provision, "predecessor" means an entity that "no longer exists, having been replaced by the successor."  FAR: Information on Corporate Contractor Performance and Integrity, 79 Fed. Reg. 71975, 71976 (proposed Dec. 4, 2014) (to be codified at 48 C.F.R. pts. 1, 4, 9, 22, and 52).[12] Vectrus contends DynCorp does not satisfy this definition because it has not ceased to exist. Pl.'s Mot. at 31.  Indeed, both of DynCorp's business units, DynLogistics and DynAviation, continued operations, including performing existing contracts.  Pl.'s Reply at 25-26; *see* Hr'g Tr. 31:14-22.  And Amentum concedes that "DynCorp had only transferred, 'portions' of its two [business units] to Amentum."  Pl.'s Mot. at 32.

Vectrus argues that a further reason DynLogistics, specifically, cannot be Amentum's predecessor is that only legal entities can be considered predecessors and DynLogistics "is not, and has never been, a 'legal entity.'"  Pl.'s Reply at 30.  Vectrus contends "entity" as used in FAR § 52.204-20 means "legal entity" based on FAR Council notes promulgating a sister regulation — FAR § 52.204-17.  Pl.'s Mot. at 34-35.  There, the FAR Council explained that "the term 'entity' . . . in this context, means a 'legal entity.'"  FAR; Commercial and Government Entity Code, 79 Fed. Reg. 31187, 31189 (May 30, 2014) (to be codified at 48 C.F.R. pts 1, 4, 12, 22, and 52).

Amentum and the government discount the probative value of Amentum's SAM entries as clerical errors and contend the entries do not overcome the evidence that Amentum was DynCorp's successor.  Def.'s Reply at 12; *see also* Amentum's Reply at 12 (suggesting Amentum did not identify itself as DynCorp's successor because it "has not absorbed all aspects of the company").

Responding to Vectrus's regulatory interpretation, Amentum and the government argue that Vectrus's definition of "predecessor" under the FAR is "artificially narrow."  Def.'s Cross-Mot. at 13.  The government relies on a broader excerpt of FAR § 15.305(a), the source-selection provision at issue, arguing Amentum is a successor because it "has replaced [DynCorp] *by acquiring the assets and carrying out the affairs of [DynCorp] under a new name*" by an

---

[11] The SAM database "[e]stablish[es] a common source of vendor data," FAR § 4.1100(b), that the government uses to "support analysis of the federal award lifecycle," Gen. Servs. Administration, *Data Bank*, SAM.gov, https://sam.gov/reports/awards/standard (last visited June 29, 2023).

[12] Vectrus points out that the government and Amentum have both argued that the definitions of predecessor and successor in FAR § 52.204-20 inform those terms in FAR § 15.305, the operative provision for the reasonably predictive analysis.  Pl.'s Reply at 22.

acquisition or merger.  *See id.* (quoting FAR § 52.204-20(a)).  The government also points out that FAR § 52.204-20(a) was not intended to limit "when an acquisition of assets and personnel between companies was sufficient to form a successor relationship" and that the Navy chose not to incorporate FAR § 52.204-20 into the solicitation.  *Id.* at 14.  Neither this section nor another FAR provision define predecessor to require that that entity entirely dissolve.  Thus, that DynCorp's "relevant assets have been transferred to Amentum" and Amentum is "in the position to bring those assets to bear" on the contract is sufficient to render DynCorp a predecessor to Amentum — even if DynCorp has not entirely ceased to exist.  *Id.* at 13-14.  Amentum adds that no statutory or regulatory provision prohibits the Navy from "considering a company to be the successor of another still-existing entity for the purposes of a past performance evaluation."  Amentum Cross-Mot. at 27.  Moreover, Vectrus's narrow definition of "predecessor" is "at odds with the broad mandate in FAR § 15.305 for agencies to consider past performance information from a range of sources including 'key personnel who have relevant experience, or subcontractors that will perform major or critical aspects of the requirement,' or 'any other source.'"  Amentum's Reply at 11 (quoting FAR § 15.305).

Next, the government contends DynLogistics can be permissibly treated as the subject entity for the reasonably predictive analysis, even though it is not a legal entity.  *See* Def.'s Reply at 11-12.  On this view, Amentum's mission readiness SBU replaced DynLogistics once the integration was complete.  The government rejects Vectrus's argument that "entity" means "legal entity" because it rests on "a collection of anecdotes from the FAR Council's consideration of the term 'entity'" in a different context and the "FAR language at issue is not even binding on the government."  Def.'s Reply at 12.  It contends that "the ordinary meaning of 'entity' can certainly be understood to include a business unit."  *Id.*

The Navy's reasonably predictive analysis is in accordance with law.  No applicable FAR provision narrows the definition of predecessor to prohibit an agency from considering information about DynCorp's past performance on the contracts a predecessor performance, and the plain meaning of the term predecessor encompasses the elements of DynCorp responsible for performing the [xxx] contracts.  Amentum acquired the elements of DynCorp International responsible for performing the contracts, integrated those elements into its mission readiness unit, and carries out those contracts under Amentum's name.

The scope of the term predecessor is informed by the context in which it is applied.  Here, that context is whether predecessor performance is reasonably predictive of a successor's ability to perform the contemplated project.  *See* FAR §§ 15.302 ("The objective of source selection is to select the proposal that represents the best value."), 15.305(a) ("Proposal evaluation is an assessment of the proposal and the offeror's ability to perform the prospective contract successfully" and "[p]ast performance information is one indicator of an offeror's ability to perform the contract successfully.").  The federal acquisition regulatory regime gives agencies broad discretion regarding which sources of past performance and corporate experience to consider.  *See* FAR § 15.305(a)(2)(ii) (permitting the government to consider information the offeror submits and "information obtained from any other sources"); *Alisud*, 161 Fed. Cl. at 668 ("[D]eference to agency past performance evaluations extends to the extent of the review.").  Because agencies are permitted to look beyond an offeror's submission, there is an asymmetry in

what information an agency may or must consider and what information an offeror must disclose.

The Navy's treatment of DynCorp's performance as reasonably predictive does not violate the relevant source-selection provision, FAR § 15.305(a)(2)(iii).  That provision instructs the Navy to "take into account past performance information regarding predecessor companies" and "key personnel who have relevant experience."  FAR § 15.305(a)(2)(iii).  The Navy is empowered to assess the "relevance of the information," including information it is permitted but not required to consider and information from outside the proposal, in deciding what weight to assign past performance and experience.  *See* FAR § 15.305(a)(2)(i); *see also Bailey Tool & Mfg. Co. v. United States*, 117 Fed. Cl. 457, 466 (2014) (recognizing an agency's discretion to consider information beyond the proposal when determining an offeror's responsibility); *In re Cont'l Mar. of San Diego, Inc.*, B-249858, 1993 WL 86794, at *4 (Comp. Gen. Feb. 11, 1993) ("In evaluating proposals, the contracting agency may consider evidence from sources outside the proposal.").  The Navy complied with these regulations in deciding to focus its past performance analysis on the elements of pre-acquisition DynCorp that performed the contracts claimed by Amentum.

The term "predecessor" is not defined in the subpart of the FAR governing source selection for contracting by negotiation.  *See generally*, FAR § 15.3.  The parties agree that FAR § 52.204-20(a)(2)'s definition of predecessor and successor is instructive, but dispute how that section defines the term.  That provision defines terms "predecessor" and "successor" together. FAR § 52.204-20(a)(2).  A predecessor is "an entity that is replaced by a successor" and a successor is "an entity that has replaced a predecessor by acquiring the assets and carrying out the affairs of the predecessor under a new name (often through acquisition or merger)."  *Id.* Amentum acquired the assets that, up until that point, DynCorp used to perform the [xxx] contracts.

Vectrus's attempts to limit the definition of predecessor to "legal entities" fails. Vectrus's relies primarily on FAR Council notes addressing comments in finalizing FAR § 52.204-17, a related provision, to support this restriction.  There, in response to the comment that "the rule is unclear on how Limited Liability Companies (LLCs) and joint ventures are to be treated," the Council noted that it had clarified the definitions to address "the issue of joint ventures" and revised "the term 'business entity' . . . to use the term 'entity' which, in this context, means a 'legal entity.'"  FAR; Commercial and Government Entity Code, 79 Fed. Reg. at 31188.

Vectrus's argument relying on this commentary is undercut by three facts.  First, regulatory history is less persuasive to the extent that it does not contradict the regulation's plain language.  *See Bank of Am. Corp.*, 964 F.3d at 1106.  The relevant FAR provisions all use the term "entity" without limiting it to any particular type of entity.  *See* FAR §§ 15.305, 52.205-17(a)(2) (defining highest-level and immediate owners for solicitations requiring CAGE code reporting), and 52.204-20(a)(2) (defining predecessor and successor for solicitations requiring

CAGE code reporting).  The term entity is used in a variety of senses throughout the FAR,[13] and the plain meaning of the word "entity" encompasses a wide range of organizations, including business units that have legal identities apart from their members or owners.  *See Entity*, Black's Law Dictionary (11th ed. 2019); *see also Entity*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/entity (defining entity as a thing with "independent, separate, or self-contained existence" and "an organization (such as a business or governmental unit) that has an identity separate from those of its members") (last visited June 29, 2023).  The FAR Council did not limit the term entity to legal entities in the final text of the regulations in question.

Second, the provision on which the Council was commenting arises in a different context from FAR § 15.305.  Part 52 of FAR "gives instructions for using provisions in clauses in solicitations and/or contracts" and "sets forth the solicitation and contract clauses prescribed by this regulation."  FAR § 52.000.  More specifically, the FAR requires the language the Council commented on to be included only in solicitations that also include FAR § 52.204-16, which requires offerors to meet certain CAGE code reporting requirements.  *See* FAR §§ 4.1804, 52.203-16.  The Philippines contract solicitation had no such requirement.  *See* AR 1727-33.  In the CAGE code reporting context, restricting the definition of predecessor eased the reporting burden on offerors.  In this context, restricting the definition of predecessor would limit the information the Navy is permitted to consider and would deviate from the broad discretion FAR generally provides agencies in conducting source selection.  Third, the Navy chose not to include FAR § 52.204-17 in its solicitation.

Vectrus's attempts to limit the definition of predecessor to exclude "entities" that continue to exist likewise fails and for similar reasons.  Vectrus again relies on FAR Council comments narrowing the term "predecessor" in the context of an offeror's reporting obligations. In this instance, the Council notes that Vectrus cites address what predecessor past performance an offeror must disclose in FAPIIS.  *See* FAR § 9.104-6(a)(1)(ii); FAR: Information on Corporate Contractor Performance and Integrity, 79 Fed. Reg. at 71976.  As the Council explains, "[a]lthough the law requested information on successor entities," any entity subject to FAPIIS disclosure as an offeror "would have to be the successor, because by definition the predecessor no longer exists, having been replaced by the successor."  FAR: Information on Corporate Contractor Performance and Integrity, 79 Fed. Reg. at 71976.  This recognizes that when an entity transferred assets associated with past performance to another entity, only successor entities that "replaced a predecessor acquiring the assets" could be required to disclose those assets in FAPIIS or by solicitations that incorporate CAGE code reporting requirements. *See* FAR §§ 52.204-20, 4.8104(d), 9.104-6(a)(2)(ii).  Again, giving effect to the narrower definition of "predecessor" that is not adopted in the text of the cited FAR provisions (which

---

[13] *See, e.g.*, FAR §§ 225.7021-1 ("Covered entity means any corporation, company, limited liability company, limited partnership, business trust, business association, or other similar entity, including any subsidiary thereof."), 552.270-33 ("Foreign entity means" a "Corporation, company, business association, partnership, society, trust, or any other nongovernmental entity, organization, or group.").

were also not incorporated into the solicitation) would limit the information the Navy is permitted to consider.

Moreover, the FAR Council notes on FAPIIS disclosure support the Navy's decision to treat Amentum as DynCorp's successor with respect to these contracts. The entity that performed the contracts at issue here was reconstituted by Amentum, more specifically Amentum's mission readiness unit, when Amentum finished integrating the assets and personnel associated with the contracts.

Nor did the Navy err by failing to state expressly that DynCorp is Amentum's predecessor. *Choctaw* does not provide that an agency must first find an entity is another's predecessor before conducting the reasonably predictive analysis. Instead, in adjudicating the protest, GAO pointed out that "[t]he key consideration is whether the experience evaluated reasonably can be considered predictive of the offeror's performance under the contemplated contract." 2016 WL 6212358, at *3. This confirms that, rather than being a separate threshold finding, the predecessor-successor analysis is informed by the agency's reasonably predictive analysis.[14] Accordingly the Navy's reasonably predictive analysis complied with the relevant FAR provisions defining predecessor for the purposes of its reasonably predictive analysis.[15]

---

[14] For the same reason, *in re MLU Services, Inc.* does not support Vectrus's argument. B-414555.3, 2017 WL 3215118 (Comp. Gen. July 17, 2017). Like *Choctaw*, GAO in *MLU Services* emphasized that the "key consideration" is whether the experience relied upon is reasonably predictive of the offeror's performance. 2017 WL 3215118, at *8. And, as in *Choctaw*, GAO's analysis illustrates that the predecessor-successor analysis is informed by the reasonably predictive analysis and is not analytically distinct. *Id.* (reasoning that nothing in the proposal would permit the agency reasonably to determine a company's experience was predictive of the offeror's because the offeror's proposal did not list the claimed company as a predecessor or a subcontractor or identify any key personnel).

[15] Each party contends that its position is supported by cases applying the de facto merger doctrine. *See* Pl.s' Mot. at 31-33; Pl.'s Reply at 25-28; Amentum's Cross-Mot. at 29-31; Def.'s Reply at 11. Based on the record and to the extent that doctrine is analogous, crediting Amentum with DynCorp's contracts is consistent with the equitable considerations animating the de facto merger doctrine. That doctrine functions to ensure a transferor company's creditors and tort victims could recover on their claims by preventing another company from acquiring nearly all the transferor company's assets without also acquiring its liabilities. *See* 19 Am. Jur. 2d Corporations § 2288. In the context of a bid protest, the corollary equitable considerations would prevent a company from claiming only the positive past performance of an acquired entity and disclaiming that entity's negative past performance. Plaintiff points to no evidence in the record suggesting Amentum selectively relied upon its acquisition of DynCorp to ensure the Navy attributed only positive DynCorp past performance to Amentum. This observation underscores the fact that federal procurement is distinct from the de facto merger doctrine because offerors are both permitted and incentivized to submit only projects illustrating positive past experience.

*3.   The Navy's reasonably predictive analysis is supported by the record.*

Vectrus finally challenges the Navy's reasonably predictive analysis as unsupported by the record.  Pl.'s Mot. at 35-37.  The Navy's conclusion that the DynCorp contracts are reasonably predictive of Amentum's ability to perform the Philippines contract rests primarily on its finding that DynCorp had transferred its assets and nearly all employees involved in performing those contracts to Amentum.  *Id.* at 36.  Vectrus argues the Navy's finding — that Amentum "employs approximately [xxx] non-supervisory employees" and "over [xxx] DynCorp legacy executives and supervisors" who worked on [xxx] of the [xxx] contracts, AR 16262 — is unsupported by the record because "Amentum's proposal *never* stated" these employees "were now 'employed' by Amentum," Pl.'s Mot. at 26.  Indeed, the 2021 memorandum even stated that "*DynCorp will remain the employer of DynCorp Employees,*" and that these employees were still paid by DynCorp.  *Id.* at 36-37 (quoting AR 15526) (plaintiff's emphasis).

 The government and Amentum reply that the Navy reasonably relied upon documentation and multiple declarations of management personnel that confirmed the transfer of personnel and proprietary business management tools.  Def.'s Cross-Mot. at 15-16.  That DynCorp and Amentum are both identified on paychecks is inapposite because, as indicated in information it provided the Navy during the agency-level protest initiated in May 2022, "*all employees* have been moved to the Amentum employment platform . . . and consider themselves Amentum employees . . . paid using . . . Amentum payroll."  *Id.* at 16 (quoting AR 15696-97) (defendant's emphasis); Amentum's Cross-Mot. at 31-32.  Moreover, the reasonably predictive analysis need not "rely on the legalities of any employment relationship."  Def.'s Cross-Mot. at 16.

The administrative record supports the Navy's finding that DynCorp is Amentum's predecessor.  Substantial evidence supported the Navy's decision to attribute DynCorp's past performance to Amentum.  Vectrus does not contest that DCMA eventually executed novation agreements recognizing that all [xxx] contracts and the associated assets were transferred to Amentum before July 2022, the Amentum submission upon which the Navy most recently affirmed its award decision.  *See* Hr'g Tr. 60:17 to 61:3.  Multiple Amentum management personnel confirmed that the DynCorp employees and proprietary business tools enlisted in performing the relevant contracts had been transferred to Amentum.  *See, e.g.*, AR 14440-46 ¶¶ 6-23 (Decl. of [xxx]) (May 25, 2022), 15613-14 ¶¶ 5-7 (Decl. of [xxx]) (May 16, 2022), 15616-17 ¶¶ 6-11 (Decl. of [xxx]) (May 16, 2022).  In its agency-level protest, Amentum identified specifically the Amentum-controlled personnel who had worked on the DynCorp contracts it claimed and would continue to work on those contracts, including [xxx] non-management employees as well as over [xxx] supervisory personnel.  *See* AR 15643-58; Hr'g Tr. 63:11-22.  Amentum's submission included contemporaneous business and legal records supporting these representations, including organizational charts reflecting the integration process, novation packages, internal correspondence, and merger documents.  *See* AR 14106, 14158-523, 19423.

Vectrus isolates a few statements and omissions within these documents.  First, it focuses on Amentum's statement in the 2021 memorandum of agreement's statement that "DynCorp will remain the employer of DynCorp employees."  AR 15526.  But that agreement went on to state that those employees "shall support Amentum and [the] transferred contracts."  AR 15526.

Vectrus also relies on the fact that DynCorp's name appears next to Amentum's on certain employees' paychecks. Nevertheless, that the employees who worked on the claimed projects would continue working on those contracts is more predictive of Amentum's ability to perform the Philippines contract than whether those employees are formally employed by Amentum or its wholly owned and controlled subsidiary. Vectrus also emphasizes Amentum's failure to expressly refer to the employees as Amentum employees in its proposal and again discusses its representations in the SAM database. Taken together these isolated statements and omissions do not outweigh the strong evidence in favor of treating DynCorp's past performance as reasonably predictive of Amentum's. Accordingly, the weight the Navy assigned this evidence is reasonable, and its conclusion that DynCorp is Amentum's predecessor for the purposes of the [xxx] contracts at issue is supported by the record.

Vectrus again relies on *Choctaw*, arguing that Amentum, like the *Choctaw* offeror, fails to establish it was a successor of the past performance and experience contracts cited in its proposal. But *Choctaw* is factually distinct from this case. In *Choctaw*, the offeror represented that the predecessor companies had neither been "acquired by [n]or merged with other companies," nor had they been "reorganized, restructured, or otherwise altered." 2016 WL 6212358, at *3 (internal quotations omitted). Additionally, the agency in *Choctaw* had concluded that the offeror's proposal "did not show how the management team would have meaningful involvement in the contract performance" and provided "no description of the work each performed on the prior contracts." 2016 WL 6212358, at *5. Here, the Navy determined when it affirmed its contract award in July 2022 that all the relevant assets had been transferred to Amentum and that key personnel and technologies associated with the claimed past performance had all been integrated into Amentum's mission readiness business unit. *Compare* AR 15358 (pre-integration organization chart) *with* AR 15640 (post-integration organization chart). These findings adequately support the Navy's conclusion that DynCorp's contracts could be attributed to Amentum as predecessor experience.

### D. Vectrus was not prejudiced by the Navy's refusal to broaden the scope of its corrective action

A protestor cannot prevail unless it was prejudiced by the government's actions. *PAE Applied Techs.*, 154 Fed. Cl. at 509. Generally, in post-award protests, a protestor must show "there was a 'substantial chance' it would have received the contract award but for the errors." *Bannum*, 404 F.3d at 1353.

Vectrus contends its protest should be assessed under the "non trivial competitive injury" standard instead. *See* Pl.'s Mot. at 17. The main factor driving which standard to apply in assessing prejudice is "whether there is sufficient factual development . . . to apply the primary 'substantial chance' standard." *Alaska Structures, Inc. v. United States*, 145 Fed. Cl. 464, 471-72 (2019) (quoting *Veteran Shredding, LLC v. United States*, 140 Fed. Cl. 759, 763 (2018)) (declining to apply an exception to the substantial chance test because "there [wa]s sufficient factual development" in a "post-bid but pre-award" protest); *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1361 (Fed. Cir. 2009) (indicating the record was not sufficiently developed to apply the substantial chance test because, in that case, "there ha[d] been neither bids/offers, nor a contract award"). Here, the factual record is sufficiently well-developed to apply the substantial

chance test: bids have been submitted and supplemented, the contract has been awarded, and the agency has, to varying degrees, addressed the claims at issue at least once if not more.

According to Vectrus but for the Navy's decision to credit Amentum with DynCorp projects, Amentum would have had zero qualifying projects and its "proposal would have been lower rated on the Past Performance factor, and would have been rated Unacceptable under the Corporate Experience [factor] for failing the [solicitation's] 'minimum standard.'" Pl.'s Mot. at 37.  Accordingly, Vectrus avers that it has been prejudiced because these different ratings would have led the Navy to award Vectrus the contract. *Id.* at 37-38.  Vectrus further contends it would be awarded the contract if the Navy found in its favor on its material misrepresentation claim. This is because an offeror that makes a material misrepresentation must be disqualified from the procurement. *See* Pl.'s Reply at 12-13.  If Amentum were disqualified, Vectrus's proposal would be the best-valued. *See* Pl.'s Mot. at 24.

According to the government, any prejudice by Amentum's representations in the original 2021 award was obviated when the Navy undertook corrective action and affirmed the award in July 2022. Def.'s Cross-Mot. at 19.  Indeed, the Navy explained the primary issue it sought to address in its first corrective action was the nature of DynCorp and Amentum's relationship and the transfer of the relevant contracts. *See* Hr'g Tr. 72:4 to 73:14; AR 19575. Because none of the omissions Vectrus raises tainted the later action, Vectrus has not established it was prejudiced by representations in the 2021 proposal. Def.'s Cross-Mot. at 19-20. Amentum makes a similar argument, relying on the fact that the Navy did not find a misrepresentation warranting exclusion had occurred when it affirmed the award.  Amentum's Cross-Mot. at 36-37.

The Navy resolved any ambiguity in Amentum's July 2021 proposal regarding its relationship to the [xxx] DynCorp contracts during its first corrective action and response to the agency-level protest.  In explaining its refusal to address Amentum's alleged misrepresentation, the Navy explained that Amentum's relationship to DynCorp regarding the claimed contracts was the "*raison d'etre* of the Agency's [first] corrective action." AR 19575.  This goal motivated the Navy to ask Amentum to specifically identify "what assets have been transferred from DynCorp to [Amentum]" and describe the "current status of DynCorp employees [who] worked on the [c]laimed [p]rojects." AR 13807.  The Navy reviewed the information Amentum provided and found it confirmed the Navy's decision to credit Amentum with the contracts.  The Navy affirmed its award to Amentum after the first corrective action based on evidence showing DynCorp had transferred to Amentum enough of the related assets to credit Amentum with the contracts.  This evidence provided the same context that supported the Navy's conclusion that Amentum did not misrepresent its relationship with DynCorp.  Because the Navy had already affirmed the award based on that relationship, the Navy refused to address Vectrus's misrepresentation claims in its second corrective action. *See* AR 19574-75.  As discussed, *supra*, at 20-22, the Navy's affirmance of the award is adequately supported by the record.  So too is its refusal to revisit its weighing of the same evidence in a second corrective action.

The lack of prejudice independently supports the Navy's refusal to address Vectrus's material misrepresentation allegations and challenges to the agency's reasonably predictive analysis in its second corrective action.

### E.  Injunctive relief

Vectrus asks this court to permanently enjoin the Navy from "awarding the [c]ontract to Amentum" until the Navy "revises the scope of its corrective action to address the two underlying errors in the procurement" and "conducts a new evaluation."  Pl.'s Mot. at 40.

The court has determined that Vectrus fails on the merits of its claim.  Vectrus has been afforded the opportunity to compete for the Philippines contract in a fair solicitation process. The government, on the other hand, has been harmed insofar as it has incurred costs under a non-competitive bridge contract while Vectrus's protests are being resolved.  An injunction is not warranted.

### CONCLUSION

Accordingly, plaintiff's motion for judgment on the administrative record and request for injunctive relief are DENIED.  The government's and Amentum's motions for judgment on the administrative record are GRANTED.

The Clerk is directed to enter judgment for defendant and defendant-intervenor.

No costs.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Senior Judge